Reza ESLAMINIA, Petitioner–Appellant,

v.

Theo WHITE, Respondent–Appellee.

No. 96–16987.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1997.

Decided Feb. 18, 1998.

Gerald F. Uelmen, Law Offices of Ephraim Margolin, San Francisco, California, for petitioner–appellant.

John H. Deist, Deputy Attorney General, San Francisco, California, for respondent–appellee.

Before: SNEED, SCHROEDER, and BRUNETTI, Circuit Judges.

SNEED, Circuit Judge:

California state prisoner Reza Eslaminia appeals the denial of his petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging his 1988 conviction for conspiracy to commit grand theft and kidnapping, kidnapping for extortion and second degree murder. We have jurisdiction under 28 U.S.C. § 2253.

Eslaminia argues that the jury's consideration of an audio tape containing a police interview of his brother—which was not admitted into evidence—had substantial influence on the jury's decision to convict. He also argues that the district court's decision to suppress potentially exculpatory evidence deprived him of a fair trial.

We hold that the tape recording, which bore on the credibility of key witnesses, was prejudicial because in this case their credibility was the central issue. Accordingly, we vacate the district court's denial of Eslaminia's petition and remand the case with instructions that he be given a new trial.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the activities of a group of young men known as the "BBC," which has been popularized in the media and in film as the "Billionaire Boys Club." The group was formed in Los Angeles in 1982 by a youthful and charismatic accountant and commodities trader named Joe Hunt and several of his friends, including Dean Karny and Arben Dosti. BBC was bound together by a theory of Hunt's known as the "paradox philosophy," which sanctioned lying, cheating and stealing as necessary and acceptable means to achieve personal and professional goals. Acting on that philosophy, BBC set out to generate income through various business ventures and investments. Start-up funding was obtained by soliciting the members' various wealthy friends and relatives, and a portion was used to obtain elegant townhomes and imported cars for members' use.

An early BBC investor was Ron Levin, a southern California resident, who promised in July 1983 to advance several million dollars, to be invested by Hunt. However, a few months later, Levin admitted that his business dealings with BBC were fraudulent and the millions illusory. Hunt reacted to this news by devising an elaborate scheme to extort money from and kill Levin. In June, 1984, Hunt and another BBC member, Jim Pittman, killed Levin and disposed of his body in a remote area north of Los Angeles. Karny was aware of the plot to kill Levin, and provided Hunt with an alibi for the night of the murder.

BBC's financial affairs deteriorated dramatically after the Levin murder. At the same time, however, Dosti became acquainted with the appellant, Reza Eslaminia. Dosti learned that Eslaminia was the son of an allegedly wealthy immigrant, Hedayat Es-

laminia ("Hedayat"), a former Iranian government official who had fled to the U.S. after the fall of the Shah. Eager to tap into these supposed family resources, the BBC set out to recruit Eslaminia to work on the group's projects. Hunt and Karny were introduced to Eslaminia at a party on July 7, 1984. After the party, Hunt told Karny that Eslaminia had described his father as very wealthy, but also complained that Hedayat had cut him off from the family fortune. As a result, father and son were estranged. Karny later testified that Eslaminia had claimed Hedayat had $30 million which he had brought from Iran.

Soon after the party, Hunt, Karny, Pittman and Dosti concocted a plan to extort money from Hedayat. According to Karny, the prosecution's primary witness, they approached Eslaminia with a plan to abduct his father, coerce him into transferring assets which would be disguised as the fruits of legitimate business transactions, and then kill him. BBC members engaged in extensive preparatory work to this end, traveling to northern California to conduct reconnaissance of Hedayat's apartment complex. They also rented a "safe house" where Hedayat could be hidden, as well as a truck and delivery uniforms to be used in the abduction. Karny testified at trial that appellant was an active participant in the plan.

According to Karny, BBC members and Eslaminia traveled to Belmont, California, to kidnap Hedayat on July 30, 1984. While Eslaminia and Karny waited outside, Hunt and other BBC members beat Hedayat and locked him inside a large trunk. The trunk was placed in a moving van and driven to Los Angeles. Somewhere in route, Hedayat died. The exact cause of death remains unknown. Hunt disposed of the body by dumping it outside Los Angeles and then attempted to salvage the plan to grab Hedayat's assets by having Eslaminia named conservator of the estate. BBC lawyers obtained a court order to that effect, and with Eslaminia's help attempted over several months to locate and seize Hedayat's assets. In fact, Eslaminia and Dosti traveled to Switzerland in an effort to withdraw money from an account in Hedayat's name. However, no additional deposits were ever located.

In the fall of 1984, several BBC members informed police that Hunt had murdered Levin. Karny, fearful that he would be implicated along with Hunt, contacted police and agreed to testify against the BBC leader and other members. After leading investigators to Hedayat's body, Karny was granted broad immunity. As a result of the details Karny thereafter provided about BBC activities, Eslaminia and Dosti were arrested and charged in connection with Hedayat's death.

At trial, Eslaminia maintained that he had not been party to the conspiracy to kidnap and extort assets from his father. Rather, he claimed that in fact he did not believe Hedayat had great wealth, and so had no motive to participate in the kidnapping scheme. Eslaminia also denied Karny's version of the actual kidnapping, and insisted that he had not participated but had instead spent the weekend at his girlfriend's home. He claimed that he was shocked when Hunt informed him of Hedayat's death, and participated in the search for his father's assets only because Hunt threatened to kill him, his family and girlfriend if he did not cooperate. Thus, the trial primarily turned on the credibility of Karny and Eslaminia with respect to their versions of events.

Eslaminia was convicted in California state court in August, 1987, and sentenced to life imprisonment without possibility of parole. The California Court of Appeals upheld the conviction, as did the district court, denying Eslaminia's petition for habeas corpus.

## II.

### STANDARD OF REVIEW

■ The district court's decision to deny Eslaminia's petition for habeas corpus is reviewed de novo. *Campbell v. Kincheloe*, 829 F.2d 1453, 1457 (9th Cir.1987).

## III.

### DISCUSSION

A. *The Taped Interview of Eslaminia's Brother*

■ At trial, the prosecution introduced a tape recording of an interview with Eslami-

nia, conducted by police. The tape, with the interview recorded on one side only, was admitted into evidence, and was physically taken by jurors into the jury room during deliberations. Following the verdict, Eslaminia's lawyers learned that the jury had also listened to the reverse side of the tape, which contained comments made by Eslaminia's brother, Ali Eslaminia ("Ali"), also recorded during an interview with a police officer. Ali's interview had not been admitted into evidence, and Ali did not testify at trial.

■■■ It is clear that the jury's consideration of the tape is a serious error of constitutional dimensions.[1] Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment. *Dickson v. Sullivan,* 849 F.2d 403, 406 (9th Cir.1988). Not every constitutional error, however, is grounds for reversal. On collateral review, we must determine whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 627, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Errors that do not have a "substantial and injurious effect" on the trial's outcome are

deemed harmless. *Bonin v. Calderon,* 59 F.3d 815, 824 (9th Cir.1995).

Eslaminia claims that many of Ali's comments had a "substantial and injurious effect" because they directly impeached his credibility, as well as that of witnesses relied on by the defense, while simultaneously bolstering the prosecution's theory of the case and enhancing the credibility of the key prosecution witness, Dean Karny.

For instance, Ali may be heard on the tape telling police that he "always thought" Hedayat "had a lot of money ... put away somewhere." He also noted that title to property Hedayat owned in Iran was placed in the names of Ali and his other brothers, but that Eslaminia had been excluded from ownership. However, a key element of Eslaminia's defense was that although he had told Hunt and other BBC members that his father was wealthy (ostensibly in order to curry favor with the group), he actually knew that Hedayat had lost his property when the Shah fell from power and was relatively poor. Eslaminia therefore claimed he had no reason to hate his father for cutting him off from the family fortune, which was illusory. As a result, he had no motive to kidnap, extort and murder him. Ali's comments directly impeach this crucial pillar of the defense, as they demonstrate that at least one close family member did believe that Hedayat had

---

1. As a threshold matter, Eslaminia claims that the jury's consideration of the tape is a "structural error," requiring automatic reversal and a new trial. We reject this contention, instead evaluating the consideration of the extrinsic evidence under the harmless error standard applied to "trial errors." Structural errors are relatively rare, and consist of serious violations that taint the entire trial process, thereby rendering appellate review of the magnitude of the harm suffered by the defendant virtually impossible. Such violations include the total deprivation of the right to counsel, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); the presence of an partial judge, *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); and the unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

By contrast, jury consideration of taped comments by a non-testifying party raises discrete evidentiary issues that the court may clearly identify and analyze, and is similar to other commonly-recognized trial errors. *See Delaware v.*

*Van Arsdall,* 475 U.S. 673, 674, 106 S.Ct. 1431, 1433, 89 L.Ed.2d 674 (1986) (holding that restrictions on a defendant's right to cross examine witnesses for bias reviewed for harmless error); *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973) (harmless error analysis applies to the admission of an out-of-court statement by a nontestifying codefendant).

Nevertheless, Eslaminia argues that this court's decision in *United States v. Noushfar,* 78 F.3d 1442 (9th Cir.1996) compels automatic reversal for structural error. *Noushfar,* however, was a very different case than the present one. There the trial judge intentionally allowed 14 incriminating tapes containing conversations with the defendants themselves into the jury room. 78 F.3d at 1444–45. The quantity of the extrinsic evidence and its incriminating character made it impossible for the reviewing court to determine the impact on jurors. By contrast, the present case involves one tape, not of the defendant. So too, while the taped comments do seriously impact Eslamania's credibility, they are not directly incriminating.

great hidden wealth, and reinforce the prosecution's contention, supported by Karny's testimony, that Eslaminia believed so as well.

In addition, during the taped interview Ali vehemently attacked the character of Colonel Aliakbar Baniaman, Hedayat's close friend, business associate, and prosecution witness. Ali told police he distrusted Baniaman, and that the Colonel had "ripped off" his father many times. Ali disparaged Baniaman's tearful reaction to Hedayat's disappearance, noting that "I know this guy. He doesn't get teary, man . . . Doesn't cry, he's not going to cry over something like my Dad especially, not that guy." Ali also accused Baniaman of lying about other matters related to Hedayat's disappearance.

Although a prosecution witness at trial, Baniaman provided much testimony vital to the defense. First, Baniaman contradicted the prosecution's theory that Eslaminia and Hedayat hated each other. He testified that he believed the two had a fairly normal father-son relationship. Second, Baniaman, who had an intimate knowledge of Hedayat's financial affairs, testified that Hedayat had limited wealth and no hidden assets, thus undermining the prosecution's assertion that Eslaminia was driven by greed to participate in his father's murder. Third, Baniaman directly contradicted Karny's testimony to the effect that Eslaminia had telephoned Baniaman in an attempt to get information about Hedayat in preparation for the kidnapping. According to Baniaman, the final time he received a call from Eslaminia was nearly a month prior to the kidnapping—before Eslaminia had even met Hunt or Karny at the BBC party. So too, Baniaman contradicted Karny's testimony that Eslaminia had given the Colonel opium in exchange for information about Hedayat's habits and travel plans that would facilitate the kidnapping. Finally,

Baniaman provided a general endorsement of Eslaminia's character, testifying that he loved the younger man as a son, emphasizing that Eslaminia was always welcome in his home.

By impugning Baniaman's character and thus his credibility, Ali's comments may very well have caused the jury to doubt these important elements of Baniaman's testimony helpful to the defense. As such, Ali's remarks must be considered very prejudicial to the defense.

Some of Ali's other remarks, while perhaps less prejudicial, nevertheless should be considered to have had a "substantial and injurious" effect. Ali expressed to the police that he thought his father would "probably yell and scream if they're trying to drag him off." This supported Karny's trial testimony that he heard shrieks during Hedayat's abduction, and enhanced Karny's overall credibility.

So too, Ali was recorded as saying that when he and Eslaminia were young boys, they knew in advance of Hedayat's intention to take them from Iran to the United States. This directly contradicted Eslaminia's testimony, in which he told jurors that he did not know of his father's plans to flee Iran until he was actually on board the airplane, winging his way west. While the tale of the Eslaminia family's immigration to the U.S. was offered merely as incidental background information at trial, Ali's direct impeachment of Eslaminia's version of events casts doubt upon the latter's overall credibility. In a trial that, in essence, was a credibility contest between prosecution witnesses and Eslaminia, such impeachment may be decisively prejudicial.[2]

■ The state counters that all of Ali's comments are so insignificant or undeserving of the pernicious meaning attributed to them

---

2. Eslaminia also claims that two other comments Ali made on the tape must be considered prejudicial. First, Ali referred to his cousin, who testified at trial, as a "good guy" and a "good businessman." Eslaminia argues that this supported the cousin's character and lent credence to his testimony. While this may or may not be this case, we find the brief laudatory reference of little consequence, in that the cousin was a minor witness and testified to nothing of importance. Second, Ali told police that he was living

in his car, subsisting by doing menial jobs and on handouts from friends. Eslaminia claims this reflected poorly on his own character, portraying him as a callous person who would allow his own brother to go homeless while he indulged in a lavish life-style. It is unlikely, however, that the jury would draw such an attenuated inference on its own initiative. Therefore, the remarks describing Ali's living conditions can not be said to have had a "substantial or injurious effect."

by Eslaminia that they may be safely deemed harmless or, alternatively, that the comments are duplicative or cumulative of evidence properly admitted at trial. As the foregoing discussion makes clear, the state's contention that Ali's comments were relatively innocuous and could not have been interpreted by the jury as either prejudicial to the defense or determinative of its verdict is without merit.

As to the state's second argument, this court has recognized that a jury's consideration of extrinsic evidence may be harmless if the evidence is merely cumulative of other evidence adduced at trial. *Jeffries v. Wood,* 114 F.3d 1484, 1491 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997), citing *United States v. Bagley,* 641 F.2d 1235, 1241 (9th Cir.), *cert. denied,* 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981). In the present case, it is true that other evidence was introduced at trial that may be considered similar in content and tone to many of Ali's comments. For instance, several witnesses testified that Eslaminia and Hedayat had a contentious relationship and fought over money, therefore supporting the prosecution's theory of motive. These witnesses were fully subject to cross-examination. Ali was not. Merely because some evidence lending credibility to this theory was properly introduced at trial does not mean that the specific, novel details provided by Ali should be considered harmless.

Under such a definition of cumulative, the jury's consideration of any extrinsic evidence that supports a broad prosecution theory would be deemed harmless as long as some evidence also supporting the theory had been properly introduced. As Presiding Justice Kline of the California Court of Appeals observed in an unpublished opinion dissenting from that court's decision to deny Eslaminia's claim of prejudice, "[i]t is difficult to imagine any extrajudicial evidence that would not in some sense prove 'cumulative' under ... (this) definition."

 To be truly considered cumulative, there must be an extremely close relationship between the extrinsic evidence and the evidence actually admitted. For instance, in *Hughes v. Borg,* 898 F.2d 695 (9th Cir.1990),

the jury reviewed an unadmitted police report detailing a phone call by an anonymous informant, who relayed to officers that one of the defendant's relatives had told him that the defendant had confessed to the charged offenses, kidnapping and murder. Jury consideration of the report was deemed cumulative and harmless, however, because one witness' testimony was an "almost word for word verbatim" recital of the information in the police report. 898 F.2d at 701. Because the report was an almost exact duplicate of the properly admitted testimony, it could not have prejudiced the verdict. Here no such precise match between the extrinsic and admitted evidence exists. Rather, the first-person views and opinions of a close family member, a son of the victim, clearly constitute unique and unduplicated evidence.

In sum, it is clear that the taped interview contained substantial material that strongly supported the prosecution and seriously undermined the defense. Much of the damage to the defense might have been mitigated had there been an opportunity to cross examine Ali at trial. Instead, Ali was effectively allowed to "testify" to the jury in a completely unfiltered fashion, without the presence of the judge or counsel. The prosecution case was far from overwhelming, as evidenced by the fact that the jury took 10 days to deliberate, repeatedly questioned the trial judge about the law and requested the rereading of testimony, and ultimately acquitted Eslaminia on the charge of conspiracy to murder and the lesser offense of solicitation of another to commit the crime of kidnapping. The jury obviously had doubts about either the prosecution's theory, Karny's testimony, or both. Under these circumstances, Ali's comments can not be considered harmless, but must be viewed as having a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 627, 113 S.Ct. at 1716.. *See also Lawson v. Borg,* 60 F.3d 608, 613 (9th Cir.1995) (material extrinsic evidence ruled not cumulative when evidence introduced at trial was far from conclusive).

B. *The Exclusion of Possibly Exculpatory Evidence*

Eslaminia also claims that the trial judge's suppression of three categories of potentially

exculpatory evidence relevant to the jury's assessment of Karny's credibility deprived him of a fair trial. Evidence was suppressed indicating that Karny was allegedly a suspect in a murder committed nearly two years after he agreed to testify against BBC members and was granted immunity by prosecutors, that prosecutors agreed to intervene on Karny's behalf with Securities Exchange Commission officials who were contemplating a civil action against Karny, and that Karny perjured himself on an application for admission to the State Bar of California.

Because we find that the jury's consideration of the tape had a substantial and injurious effect, we do not reach Eslaminia's claims regarding the suppression of exculpatory evidence by the trial court.

## IV.

### CONCLUSION

For the foregoing reasons, we vacate the district court's denial of the writ of habeas corpus and remand with instructions to enter an order stating that Eslaminia is entitled to a new trial.

REVERSED AND REMANDED.