United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 7, 1998 Decided June 19, 1998 

 No. 97-3017

 United States of America, 

 Appellee 

 v. 

 Harold Cunningham and Percy Barron, 

 Appellants 

 Consolidated with 

 No. 97-3044 

---------

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 95cr00088-01) 

 (No. 95cr00088-02)

 Stephen C. Leckar and Jonathan Zucker, appointed by the 
court, argued the causes and filed the joint briefs for appel-
lants Harold Cunningham and Percy Barron.


 Rachel Carlson Lieber, Assistant U.S. Attorney, argued the 
cause for appellee, with whom Wilma A. Lewis, U.S. Attor-
ney, John R. Fisher, and Kenneth L. Wainstein, Assistant 
U.S. Attorneys, were on the brief. Elizabeth Trosman, 
Mary-Patrice Brown, and Thomas C. Black, Assistant U.S. 
Attorneys, entered appearances.

 Before: Edwards, Chief Judge, Silberman, Circuit Judge, 
and Buckley, Senior Circuit Judge.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: Appellants raise numerous chal-
lenges to their convictions arising from a 68-count indictment 
against them. Only a few of the issues raised merit our 
attention here.

 We reject Appellant Harold Cunningham's claim that the 
District Court erred in permitting him to represent himself at 
trial. The District Court's findings that Cunningham's deci-
sion to represent himself was knowing and voluntary met the 
criteria specified in Faretta v. California, 422 U.S. 806 (1975), 
for determining when a defendant may exercise his constitu-
tional right to forego his right to counsel. In particular, we 
reject Cunningham's assertion that he was faced with a 
"Hobson's choice" between representing himself or accepting 
inadequate counsel. The record indicates that the District 
Judge assured herself that Cunningham's attorney was ade-
quately prepared for trial and made every reasonable effort 
to reassure Cunningham regarding his counsel's competence 
and preparedness in response to Cunningham's expressed 
concerns about his trial counsel. Where a defendant's com-
plaints against counsel plainly lack merit, a court cannot allow 
itself to be manipulated into granting a continuance and 
appointing new counsel just to placate a defendant threaten-
ing to represent himself.

 Appellant Percy Barron argues that the inadvertent sub-
mission of unadmitted evidence to the jury during its deliber-
ations constitutes a violation of the Sixth Amendment, re-
quiring a reversal of all the convictions against him. The 
Government responds that, although the alleged error was 


constitutional, there was overwhelming, untainted evidence 
sufficient to support Barron's convictions, so the error should 
be deemed harmless. Recent Supreme Court cases, as well 
as cases from this circuit, have clarified that harmless error 
review of constitutional errors calls for an inquiry as to 
whether the Government has shown beyond a reasonable 
doubt that the error at issue did not have an effect on the 
verdict, not merely whether, absent the error, a reasonable 
jury could nevertheless have reached a guilty verdict. Ap-
plying this standard, we find that the Government has failed 
to show beyond a reasonable doubt that the error at issue 
did not affect the jury's verdicts pertaining to the charges 
arising from the Sun Ray Market shootings. Accordingly, 
we reverse Barron's convictions arising from that incident. 
However, applying the same standard, we decline to reverse 
the convictions of Barron that were unrelated to the Sun 
Ray Market shootings.

 In addition, we hold that several of Appellants' convictions 
should have been merged for sentencing purposes. Each 
Appellant's two convictions for armed robbery arising out of 
the Sammy's Liquor Store incident should merge into one, 
since Appellants robbed only the liquor store and not its 
employees. Also, each Appellant's armed robbery convictions 
should merge with their felony murder convictions where the 
indictment specified the armed robberies as the predicate for 
the felony murder counts. In addition, all eight of Cunning-
ham's convictions under 18 U.S.C. s 922(g) should be merged 
into one, since the jury was never instructed that, to convict 
on each section 922(g) charge separately, it must find that the 
weapons were separately acquired or stored.

 I. Background

A. The Indictment

 On April 13, 1995, Appellants Harold Cunningham and 
Percy Barron, together with codefendant Billy Richardson, 
were charged, pursuant to both federal and District of Colum-
bia law in a 68-count indictment, with a series of armed 
robberies, assaults, and murders committed over a 139-day 


period in the summer of 1993. The indictment charged 
Appellants with Racketeer Influenced and Corrupt Organiza-
tion ("RICO") counts for operating and conspiring to operate 
a criminal enterprise in violation of 18 U.S.C. s 1962(c) 
(counts 1-2) and with separate charges relating to several of 
the predicate racketeering acts (counts 3-68). The predicate 
acts arise from fifteen separate incidents alleged in the 
indictment: (1) the Sibley Plaza armed robbery; (2) the 
Discount Carpet armed robbery; (3) the IBEX Club assaults; 
(4) the Marvin Thomas assault; (5) the armed robbery of 
Officer Barnes; (6) the Annapolis armed robbery; (7) the 
Sammy's Liquor armed robbery; (8) the assault on Officer 
Hasenpusch; (9) the Horace and Dickie's armed robbery; 
(10) the attempted U-Haul armed robbery; (11) the Fair 
Liquor murders and robberies; (12) the Tyrone Holland 
murder; (13) the Sun Ray Market shootings; (14) the Marvin 
Thomas murder; and (15) the assault on Officer McDowell. 
The indictment charged Cunningham with various offenses 
arising from all fifteen of the alleged incidents; Barron was 
charged with specific offenses arising from all the incidents 
except for the assault of Officer McDowell. In addition, 
Appellants were charged with various gun possession of-
fenses.

 B.Cunningham's Election to Represent Himself

 Robert Tucker, of the Federal Public Defender's office 
("FPD"), represented Cunningham from the time of Appel-
lant's arraignment until early April 1996. The record indi-
cates that Cunningham became dissatisfied with Tucker's 
representation after reading a newspaper article about the 
offenses with which he was charged. Apparently, Cunning-
ham interpreted this article as insinuating that Tucker be-
lieved Cunningham to be guilty of the charges alleged. See 
Tr. 4/26/96 at 7.

 In an effort to placate Cunningham, the FPD replaced 
Tucker with Gregory Spencer. Prior to his appointment, 
Spencer had served as co-counsel to Tucker, first entering an 
appearance on March 6, 1996. At a status hearing on April 
26, 1996, shortly before trial was then scheduled to begin, 
Cunningham expressed concern that Spencer would simply be 
picking up from where Tucker had left off, and stated that he 


did not want to be represented by anyone from FPD. Id. at 
8. In response to questioning by the court, Spencer con-
firmed that he had fully examined Cunningham's file and 
conferred with Cunningham. He also stated that he felt he 
could make his own strategic decisions in the case, but that 
his ability to take an entirely new approach to the case would 
be "handicapped, to some degree" by the fact that most of the 
initial case preparation had been completed before he became 
involved in the case. Id. at 9-10.

 The court denied Cunningham's request for a change of 
counsel, stating that it had "no reason to doubt the compe-
ten[ce], the zealousness, the seriousness or the belief of Mr. 
Spencer in the merits of his client's case." Id. at 12-13. The 
court also explained that the newspaper article about which 
Cunningham had complained could not be fairly read as an 
indication that Tucker believed Cunningham was guilty of the 
crimes alleged. Rather, the article had simply quoted Tuck-
er's motion to dismiss the case which, in turn, had summa-
rized the Government's allegations against Cunningham. Id. 
at 10-12. The court said the motion to dismiss was "vigor-
ously written, ... extensively researched, and raised every 
argument that I can imagine could have been raised." Id. at 
12.

 At this point, Cunningham asserted that, if his request for 
new counsel were to be denied, he would rather represent 
himself. Id. at 13. The trial judge warned Cunningham that 
this was a risky decision, detailed for him some of the 
rigorous trial procedures he would be expected to follow, and 
admonished him to think carefully and consult with his family 
before making such a grave decision. Id. at 119-23. At a 
pretrial hearing a few days later, the trial judge conducted a 
more detailed explanation of the demands of the criminal trial 
process, inquired into Cunningham's understanding of such 
requirements, and repeatedly warned him against proceeding 
pro se. Tr. 4/30/96 at 45-60. Cunningham asserted that he 
understood "the seriousness of the case." Id. at 59. The 
trial judge briefly addressed the issue at a May 6, 1996 
hearing, reiterating her faith in Spencer's ability to zealously 
represent Cunningham, based upon his performance in the 
case thus far and the time available for further preparation 


prior to trial. Tr. 5/6/96 at 26-27. Finally, on May 21, 1996, 
the court permitted Cunningham to represent himself, ap-
pointing Spencer as stand-by counsel, making the resources 
of the FPD available to Cunningham, and advising Cunning-
ham that he could change his mind about representation at 
any time. Tr. 5/21/96 at 10-12, 65. On May 29, 1996, after 
Cunningham again reasserted his decision to represent him-
self, the court made specific findings on the record that, 
based upon her long discussions with Cunningham and his 
active participation thus far, Cunningham had made a know-
ing and intelligent waiver of his right to counsel. Tr. 5/29/96 
at 38-39.

 C.Trial and Verdicts

 Trial commenced on June 3, 1996 and concluded on July 30, 
1996.

 After several days of deliberations, the jury returned par-
tial verdicts as to each defendant on August 9, 1996, and then 
resumed deliberations. On August 15, 1996, the jury re-
turned verdicts on several of the remaining counts. The jury 
acquitted Cunningham on all charges relating to the armed 
robbery of Officer Barnes (counts 28-30) and the Horace & 
Dickie's armed robbery (counts 39-45). The jury acquitted 
Barron on all charges relating to the Sibley Plaza armed 
robbery (counts 3-5, 8). Although the jury found both Cun-
ningham and Barron guilty of the assault and gun possession 
charges arising from the Sun Ray incident (counts 56-61), it 
could not reach a verdict on the count charging Appellants 
with first-degree murder of Anthony Johnson at the Sun Ray 
Market (count 55). In addition, the jury was unable to reach 
a verdict on the RICO charges (counts 1-2). The jury 
convicted Appellants of the remaining counts charged against 
them. The court declared a mistrial as to the Anthony 
Johnson murder and RICO charges and entered judgments of 
acquittal and conviction consistent with the jury's verdicts.

 D.The Inadvertent Submission to the Jury of Unredacted 
 911 Tapes

 Appellants were charged with murdering Anthony Johnson 
and assaulting Nefaertari McCree and Bernice Douglas dur-


ing a shooting inside the Sun Ray Market on September 20, 
1993 (counts 55-57). Various gun possession changes also 
arose from this incident (counts 58-61). Romeo Williams was 
called by the prosecution to offer eye-witness testimony in-
criminating Appellants for these charges. Williams testified 
that three young men ran from the Sun Ray Market following 
the shooting, that one was tall and light-skinned and another 
was shorter and dark-skinned (descriptions which accord with 
Cunningham and Barron, respectively), and that the shorter, 
dark-skinned man was wearing a black "hoodie" and black 
cut-off jean shorts and carrying a chrome gun. These de-
scriptions match the clothing Barron was wearing at the time 
of his arrest hours after the Sun Ray incident and the 
chrome-plated Iberia pistol used in the shooting. Williams 
testified further that the two men described drove off in a 
maroon Nisson Maxima, a description which matches the 
vehicle Appellants were driving when apprehended following 
the Sun Ray incident. He further testified that he pulled up 
to the side of the vehicle to look at the two men, followed 
them for some way, and recorded the car's license plate 
number, but that he broke off the chase and called 911 when 
he grew concerned that they may have realized that he was 
following them. See Tr. 6/26/96 p.m. at 40-43, 47-57.

 Williams' credibility as a witness was seriously called into 
question by Appellants' efforts to impeach him. With 
Williams testimony in doubt, the Government sought and was 
granted leave by the trial judge to play Williams' 911 call in 
open court in order to rehabilitate his testimony regarding 
the incident. Williams' 911 call was consistent with his 
testimony at trial. See Transcript of Unredacted Tape, at-
tached to Memorandum of Law in Support of Defendant's 
Motion for a New Trial as Exhibit A, reprinted in Record 
Material for Appellee ("R.M.") at 65-66 ("Unredacted Tape, 
R.M. at ___"). The portion of the 911 tapes containing 
Williams' call was admitted into evidence, and a redacted tape 
recording containing only that call was supposed to go to the 
jury.

 The jury ultimately convicted Appellants of the assault and 
weapon possession charges arising from the Sun Ray inci-
dent, but was unable to reach a verdict on the Anthony 


Johnson murder. After the jury had rendered its verdicts 
and the court had declared a mistrial as to the remaining 
counts, the court permitted Government and defense counsel 
to meet with the jurors. During that meeting, several jurors 
mentioned that, during their deliberations, they had been 
provided with an unredacted 911 tape, which included the 
unadmitted 911 calls of eight other people as well as police 
radio transmissions related to the same event, in addition to 
Williams' 911 call.

 Upon learning of the jurors' exposure to this extrinsic 
evidence, Barron moved for a new trial, pursuant to Fed. R. 
Crim. P. Rule 33, on the ground that his Sixth Amendment 
right to confront all witnesses against him had been violated 
in that the jurors effectively heard the testimony of eight 
additional government witnesses whom he did not have the 
opportunity to confront or cross-examine at trial. Barron 
argued that this error was a "structural defect" automatically 
requiring a new trial. Alternatively, Barron argued that, 
even under the harmless error standard, the error required a 
new trial. He contended that the error could not be deemed 
harmless beyond a reasonable doubt given that the unredact-
ed tape contained various eyewitness descriptions that cor-
roborated Williams' otherwise suspect testimony, and that the 
prosecution had failed to provide any other witnesses offering 
eyewitness testimony implicating Barron in the Sun Ray 
shootings. Barron argued further that the statements on the 
unredacted tapes not only connected Barron to the Sun Ray 
charges but also, indirectly, to the remainder of the charges 
against Barron, based on the modus operandi argued by the 
prosecution and ballistic evidence gathered from the Sun Ray 
incident.

 The Government conceded that the inadvertent submission 
of the unredacted tapes to the jury was constitutional error, 
but argued that this error was harmless and, therefore, did 
not warrant reversal of any of Barron's convictions. The 
District Court held that the error did not constitute a struc-
tural defect and was harmless and, accordingly, denied Bar-
ron's motion. See Memorandum Opinion and Order, United 


States v. Barron, Crim. No. 95-88-02 (D.D.C. Feb. 20, 1997) 
("Mem.Op."). 

 II. Analysis

 On appeal, Appellants challenge their convictions on nu-
merous grounds. We have considered all of Appellants' 
claims and find most of them to lack merit. Only two of 
Appellants' challenges to their convictions warrant discussion 
here: Cunningham's claim that the District Court erred in 
permitting him to represent himself and Barron's claim that 
the inadvertent submission to the jury of the unredacted 911 
tapes renders his convictions invalid. In addition, we address 
Appellants' claims that various of their convictions should 
have been merged for sentencing purposes.

 A.The District Court Did Not Err in Permitting Cunning-
 ham to Represent Himself

 A criminal defendant has a constitutional right to represent 
himself at trial. See Faretta v. California, 422 U.S. 806 
(1975). To be valid, the defendant's election to waive his 
right to counsel must be knowing, intelligent, and voluntary. 
Id. at 835. To say that such an election must be "intelligent" 
does not mean that it must be perceived as reasonable or 
wise, for, in setting out this standard, the Court recognized 
that "it is undeniable that in most criminal prosecutions 
defendants could better defend with counsel's guidance than 
by their own unskilled efforts." Id. at 834.

 To ensure that a choice for self-representation is knowing, 
intelligent, and voluntary, a court must apprise the defendant 
of the "dangers and disadvantages" entailed by such a deci-
sion "so that the record will establish that he knows what he 
is doing and his choice is made with eyes open." Id. at 835 
(internal quotations and citation omitted). In United States 
v. Brown, 823 F.2d 591 (D.C. Cir. 1987), this court gave shape 
to this requirement. In Brown, a case with complexity and 
numerosity of counts similar to Cunningham's, several of the 
defendants claimed on appeal that the trial court erred in 
allowing them to represent themselves. 823 F.2d at 599. 


This Court denied their claim, finding that the trial court had 
engaged in a full discussion with the defendants regarding the 
risks of self-representation.

 The record discloses that the trial court engaged in a full 
 discussion with the appellants regarding the dangers of 
 self-representation. The judge informed the appellants 
 of the seriousness of the charges against them, warned 
 them that he could not assist them in their defense, told 
 them that he would have to conduct the trial in accord 
 with the Federal Rules of Evidence and Criminal Proce-
 dure, and stated that "it is a distinct handicap to be 
 engaged in a serious criminal matter without any legal 
 training or background and without the active assistance 
 of a trained lawyer." In addition, the judge asked the 
 appellants many times whether they understood his com-
 ments and whether they had any questions.

Id. (internal citation omitted). In approving this "model" of 
discourse, the Brown court emphasized that "[n]either case 
law nor common sense" requires the court to address in detail 
every possible difficulty a defendant might encounter. Id.

 The extensive colloquy between the District Court and 
Cunningham regarding his decision to represent himself 
clearly meets the standard set forth in Brown. This colloquy 
took place over the course of several days. On each occasion, 
Judge Kessler sternly warned Cunningham of the dangers 
and disadvantages of proceeding pro se and urged him to take 
more time to reconsider his decision. See Gov't Br. at 17-20 
(quoting relevant portions of transcript).

 Cunningham argues on appeal that, given his IQ of 68, he 
was unable to make an informed, knowing, and voluntary 
decision to represent himself. Throughout the pretrial pro-
ceedings relating to Cunningham's self-representation, how-
ever, the trial judge made it clear that she found Cunningham 
to be a highly intelligent person. See Gov't Br. 19-20 n.27 
and citations to transcript therein. Although a reviewing 
court decides de novo whether the record demonstrates a 
knowing, intelligent waiver of a defendant's right to counsel, 


"whether the defendant misunderstood what the court said, 
despite defendant's unambiguous answers indicating compre-
hension, is a pure question of fact which depends primarily on 
the demeanor, conduct, and intonations of the defendant" and, 
thus, is reviewed for clear error. See Virgin Islands v. 
Charles, 72 F.3d 401, 404 (3d Cir. 1995). Cunningham points 
to nothing in the record indicating that the trial court's 
findings regarding his intelligence were clearly erroneous.

 In addition, Cunningham argues that his decision to repre-
sent himself was not a voluntary decision because he was 
faced with a "Hobson's Choice" between accepting appointed 
counsel whom he felt was not prepared for trial and repre-
senting himself. Where, as here, a Faretta election appears 
grounded in dissatisfaction with counsel, the trial court must 
evaluate the defendant's objections to ensure that the self-
representation election is voluntary. It is clear that the trial 
court adequately did so here. Cunningham never offered any 
specific concerns about Spencer or the FPD other than the 
newspaper article which had caused him to doubt the loyalties 
of Tucker, his first FPD lawyer, and Spencer's "handicap" in 
utilizing groundwork which had already been completed by 
Tucker. Prior to accepting Cunningham's Faretta election, 
Judge Kessler explained that Cunningham's complaints about 
Tucker based on the newspaper article were not well-founded. 
See Tr. 4/26/96 10-12. More importantly, she found Spencer 
to be a competent and zealous advocate, based upon his 
performance during the early stages of the case as well as his 
responses to the court's inquiries, and repeatedly assured 
Cunningham of her confidence in Spencer. See id. at 10-13; 
Tr. 4/30/96 at 60 (judge did not "think for one minute that 
[Spencer] is just picking up a file"); Tr. 5/6/96 at 26 ("There 
is not a shred of evidence before this court that [Spencer] 
would be ineffective."). Where a defendant's complaints of 
his counsel's inadequacy plainly lack merit, a court cannot 
allow itself to be manipulated into granting a continuance and 
appointing new counsel just to placate a defendant threaten-
ing to represent himself. Accord United States v. Salemo, 61 
F.3d 214, 221 (3d Cir. 1995).


 B.Inadvertent Submission to the Jury of the Unredacted 
 911 Tapes

 1. Cunningham's Claims were not Preserved for Appeal

 On appeal, Cunningham seeks to join Barron's appeal on 
the issue of the inadvertent submission of the unredacted 911 
tapes, arguing that this error influenced the jury's verdicts 
against him as well as against Barron. As an initial matter, 
we find that Cunningham's claims pertaining to the 911 tapes 
are not properly before this court.

 Cunningham asserts that the District Court's standing 
order deemed Cunningham to have joined in Barron's motion 
for a new trial and that, by sentencing Cunningham before 
deciding that motion, the trial judge in effect denied the 
motion as to Cunningham. The standing order to which 
Cunningham refers, entitled "Standing Order Governing Pro-
cedures in Criminal Trial" provides that "any objection, mo-
tion or other application for relief made by any defense 
counsel orally or in writing shall be deemed to be adopted and 
joined in by every other defendant, respectively, without 
announcement by counsel to that effect, and the rulings of the 
Court shall be deemed applicable to each defendant unless 
otherwise stated at the time the ruling is made." See Cun-
ningham's Supp. Br., App. at 4. It is not clear that this 
standing order was intended to apply to post-trial motions as 
well as objections raised during the course of trial. Compare 
United States v. Gatling, 96 F.3d 1511, 1521 (D.C. Cir. 1996) 
(applying clear error standard of review for all defendants 
where at least one defendant objected during trial). The 
record provides no indication that Cunningham ever argued 
to the District Court that the 911 tapes also prejudiced him, 
and the District Court construed Barron's motion for a new 
trial as applying to Barron alone and did not make any 
findings or judgment regarding the effect of the error on 
Cunningham. See Mem. Op. at 1-6.

 Moreover, although Cunningham appealed his convictions 
prior to the District Court's denial of Barron's motion for a 
new trial, he failed to file a separate notice of appeal after the 
post-trial motion foundered. Cunningham's reliance on Unit-
ed States v. Baird, 29 F.3d 647 (D.C. Cir. 1994), in support of 


his contention that a separate notice of appeal was unneces-
sary, is misplaced. In Baird, this court simply clarified that 
the filing of a post-trial motion does not nullify a notice of 
appeal filed prior to its resolution nor bar review of errors 
that had been properly preserved independently of the post-
trial motion. Id. at 649 & n.1. Contrary to Cunningham's 
suggestion, Baird does not stand for the proposition that a 
timely-filed notice of appeal automatically includes appeal of a 
subsequently-denied post-trial motion. Indeed, the Baird 
court declined to hear the appellant's claims pertaining to the 
denial of his post-trial motion in light of his failure to timely 
appeal from the denial of the motion, notwithstanding his 
earlier-filed notice of appeal. See id. at 655.

 2. Standard of Review 

 The inadvertent submission of the unredacted 911 tapes to 
the jury violated the Sixth Amendment Confrontation Clause, 
in that it effectively provided to the jury testimony of eight 
other witnesses without allowing the defendants to confront 
or cross-examine these witnesses at trial. See Turner v. 
Louisiana, 379 U.S. 466, 472-73 (1965). Whether this consti-
tutional error requires reversal of Barron's convictions is 
governed by the harmless error standard of review. See 
Brown v. United States, 411 U.S. 223, 230-32 (1973) (admis-
sion of out-of-court statement of a nontestifying codefendant 
in violation of the Sixth Amendment Confrontation Clause 
subject to harmless error review). See also United States v. 
Treadwell, 760 F.2d 327, 339-42 (D.C. Cir. 1985) (applying 
harmless error review where appellant claimed she was enti-
tled to a new trial because a document that had not been 
offered into evidence had been sent to the deliberating jury 
inadvertently).

 Barron contends that the inadvertent submission to the 
jury of the unredacted tapes is a structural error requiring 
automatic reversal of his convictions, relying on United States 
v. Noushfar, 78 F.3d 1442 (9th Cir. 1996). We disagree. The 
type of error at issue here can "be quantitatively assessed in 
the context of the evidence presented in order to determine 
whether its admission was harmless beyond a reasonable 
doubt," Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991), 


and is not one which affects "[t]he entire conduct of the trial 
from beginning to end." Id. at 309.

 This holding is not inconsistent with those of the Ninth 
Circuit. In Noushfar, the Ninth Circuit construed the trial 
judge's provision to the deliberating jury of fourteen highly-
incriminating taped conversations between defendants and 
undercover police officers which had never been played in 
court as a "structural error" requiring automatic reversal of 
the defendants' convictions. See 78 F.3d at 1445. However, 
the Ninth Circuit later limited this holding in Eslaminia v. 
White, 136 F.3d 1234 (9th Cir. 1998), a case more closely 
resembling the instant case. In Eslaminia, a tape recording 
of a police interview with the defendant was admitted into 
evidence and provided to the jury during its deliberations. 
Id. at 1236-37. Following the verdict, defense lawyers 
learned that the jury had also listened to the reverse side of 
the tape, which contained comments made by the defendant's 
brother, also recorded during an interview with a police 
officer. The brother's comments had not been admitted into 
evidence, and the brother did not testify at trial. Id. at 1237. 
The Ninth Circuit held that this error violated the Sixth 
Amendment Confrontation Clause. Id. The defendant, rely-
ing on Noushfar, argued that this was a structural error 
requiring automatic reversal. Id. at 1237 n.1. The Ninth 
Circuit distinguished Noushfar and applied the harmless 
error standard, noting that "jury consideration of taped com-
ments by [ ] non-testifying part[ies] raises discrete evidentia-
ry issues that the court may clearly identify and analyze, and 
is similar to other commonly-recognized trial errors." Id. 
We agree with the Ninth Circuit's analysis in Eslaminia.

 Under the applicable harmless error standard, a constitu-
tional error is harmless and does not require reversal only if 
the Government can show "beyond a reasonable doubt that 
the error complained of did not contribute to the verdict 
obtained." Chapman v. California, 386 U.S. 18, 24 (1967). 
Recent Supreme Court cases, as well as cases from this 
circuit, have clarified that harmless error review calls for an 
inquiry as to whether the Government has shown beyond a 
reasonable doubt that the error at issue did not have an effect 


on the verdict, not merely whether, absent the error, a 
reasonable jury could nevertheless have reached a guilty 
verdict. See Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) 
(harmless error inquiry "is not whether, in a trial that oc-
curred without the error, a guilty verdict would surely have 
been rendered, but whether the guilty verdict actually ren-
dered in this trial was surely unattributable to the error"); 
United States v. Smart, 98 F.3d 1379, 1391 (D.C. Cir. 1996) 
(distinguishing harmless error test from mere sufficiency-of-
the-evidence test), cert. denied, 117 S. Ct. 1271 (1997); see 
also Kotteakos v. United States, 328 U.S. 750, 765 (1946) 
("The [harmless error] inquiry cannot be merely whether 
there was enough [evidence] to support the result, apart from 
the phase affected by the error. It is rather, even so, 
whether the error itself had substantial influence."); see 
generally Harry T. Edwards, To Err is Human, But Not 
Always Harmless: When Should Legal Error Be Tolerated?, 
70 N.Y.U. L. Rev. 1167 (1995) (analyzing case law on harm-
less error review and distinguishing "effect on the verdict" 
inquiry from "guilt-based" inquiry). Where there is uncer-
tainty as to the effect on the verdict, the error cannot be 
deemed harmless; rather, the court must treat the error as 
having affected the verdict. See O'Neal v. McAninch, 513 
U.S. 432, 435-36 (1995); Smart, 98 F.3d at 1391-92; United 
States v. Pryce, 938 F.2d 1343, 1349-50 (D.C. Cir. 1991).

 Resting appellate review of constitutional trial errors on a 
guilt-based inquiry into whether, even absent the error, a 
reasonable jury might have nevertheless reached a guilty 
verdict based upon the lawful evidence before it would be 
"inconsistent with the constitutional framework of our sys-
tem" which "grants criminal defendants the right to have 
juries, not appellate courts, render judgments of guilt or 
innocence." Edwards, 70 N.Y.U. L. Rev. at 1192. As the 
Supreme Court explained in Sullivan v. Louisiana, "to hy-
pothesize a guilty verdict that was never rendered--no mat-
ter how inescapable the findings to support that verdict might 
be--would violate the jury-trial guarantee." 508 U.S. at 279. 
See also Kotteakos, 328 U.S. at 763-64.


3.Barron's Convictions Arising from the Sun Ray Mar-
 ket Incident

 Barron claims that allowing the jury to hear the unredacted 
tape was not harmless error because the extrinsic evidence on 
the 911 tapes corroborated and bolstered the testimony of 
Romeo Williams who, Barron points out, was an unreliable 
witness. Given the centrality of Williams' otherwise-suspect 
testimony to the Government's case against Barron for the 
Sun Ray charges, Barron contends, the Government cannot 
show beyond a reasonable doubt that the unredacted tape did 
not influence the jury's verdicts with regard to these charges. 
Barron notes that the unadmitted 911 calls and police radio 
transmissions regarding on-the-scene witness interviews con-
clusively established that, contrary to Barron's defense, two 
shooters ran from the Sun Ray Market shooting, and that one 
of them, a young man closely resembling Barron, had carried 
a gun similar to the chrome-plated Iberia pistol fired at Sun 
Ray. See Unredacted Tape, R.M. 57-73.

 The Government offers three arguments in response. 
First, the Government contends that the error was harmless 
because the jurors may not have listened to the tape until 
after they had rendered their verdicts on the Sun Ray 
Market counts. In support of this contention, the Govern-
ment offers an affidavit provided by an FBI Special Agent 
who had participated in the jury debriefing session at which 
the error initially was discovered. See Affidavit of Special 
Agent Vincent Lisi, reprinted in Gov't Supp. Br., App. 2.

 However, as the District Court noted, neither the state-
ments of the jurors at the post-trial debriefing session nor 
that of Agent Lisi have been subject to cross-examination, 
and thus the court declined to rely on them in ruling on the 
motion. See Mem. Op. at 4 n.2. For the same reason, we 
also decline to base our ruling on the Lisi Affidavit. Instead, 
because the parties agree that the jurors were in possession 
of the unredacted tape since the commencement of their 
deliberations, we assume, absent any compelling evidence to 


the contrary, that they listened to it prior to rendering their 
verdicts on the Sun Ray charges.

 Second, the Government argues that the error was harm-
less because Williams' testimony was sufficiently bolstered by 
Williams' own 911 call--the portion of the 911 tapes that was 
played in open court and properly made available during jury 
deliberations. The Government claims Williams' testimony 
was also bolstered by his notation of the get-away vehicle's 
license number, and that the extrinsic evidence on the unre-
dacted tape had very little, if any, bolstering effect on 
Williams' testimony. This argument tracks the District 
Court's determination that although, following defense coun-
sel's efforts to impeach Williams, the jury may have had good 
reason to doubt Williams' general credibility, "his testimony 
on the narrow issue relevant to whether Mr. Barron partici-
pated in the Sun Ray Market incident was straightforward 
and credible." Mem. Op. at 4-5.

 It is for the jury, not the court, to evaluate witness 
credibility. The prosecution and the District Court acknowl-
edge that Williams' general credibility was doubtful, but 
endorse his testimony pertaining to the Sun Ray incident on 
the basis of its consistency with his properly-admitted 911 
call. However, Williams' 911 call was only admitted because 
Williams' testimony was in dire need of rehabilitation. Given 
the vulnerability of Williams' testimony in the absence of the 
911 tapes and the way in which the extrinsic evidence on the 
unredacted tapes bolstered Williams' testimony, we cannot 
find beyond a reasonable doubt that the extrinsic evidence did 
not influence the jury to accept Williams' testimony rather 
than reject it, and that its acceptance of Williams' testimony 
did not, in turn, affect its verdicts convicting Barron on the 
Sun Ray charges.

 Finally, the Government argues that, even assuming that 
the jury would have rejected Williams' testimony absent the 
error, the error must nevertheless be deemed harmless in 
light of what it describes as overwhelming, untainted evidence 
implicating Barron for the Sun Ray charges. However, the 
Government is unable to highlight any eyewitness testimony 


implicating Barron for the Sun Ray shootings equivalent to 
that of Williams and unidentified callers on the 911 tapes. 
Rather, the Government highlights the following evidence 
implicating Barron for the Sun Ray charges: motive evidence 
regarding Appellants' ongoing "beef" with Anthony Johnson 
and his organization, the Madness Connection; witness testi-
mony that Barron, with gun in waistband, made a statement 
that afternoon that he and Cunningham had to "take care of 
something;" witness testimony that Cunningham called the 
next day and told witness that they had to "get" the Madness 
Connection; Barron's admission to a cellmate of involvement 
in the Sun Ray shooting; Barron's letter to a friend, written 
while incarcerated solely on Sun Ray charges, stating his 
concern that one of the government's star witnesses was 
cooperating with authorities and discussing ways to prevent 
her from doing so. See Gov't Supp. Br. at 6 n.5 and record 
citations therein. In addition, Barron was apprehended fol-
lowing the Sun Ray incident. At the time of his arrest, 
Barron possessed a Glock rifle, and ballistics evidence showed 
that the Glock was fired at Sun Ray Market. The Govern-
ment also argues that Barron's defense--that it was merely 
coincidental that he was with Cunningham and in possession 
of the Glock hours after the shooting--is highly suspect.

 It is not inconceivable that the jury could have convicted 
Barron on the Sun Ray counts even if it had never heard the 
unredacted 911 tapes and rejected Williams' testimony. 
However, even if we find the untainted evidence against 
Barron to be overwhelming, we could not find the error 
harmless for this reason. Rather, we must determine wheth-
er the error affected the jury's verdict.

 Relying on our decision in Smart, the Government at-
tempts to equate the applicable effect-on-the-verdict inquiry 
with an overwhelming evidence inquiry. Although, in Smart, 
we stated that if "the lawful evidence against the defendant is 
overwhelming and the trial error is not a fundamental one, 
the error should be deemed harmless," 98 F.3d at 1391, we 
also emphasized that "the harmless error test we apply here 
is not a mere sufficiency-of-the-evidence inquiry." Id. In 
deeming the error at issue in Smart harmless, we emphasized 


that "[t]he totality of properly admitted evidence [against the 
defendant] was weighty and not at all ambiguous," that 
"[m]oreover, there was a virtual absence of exculpatory evi-
dence," and that "[m]ost importantly, it [was] excruciatingly 
clear that the jury did not believe [the defendant's] story." 
Id. at 1390-91. We further emphasized that where "the 
evidence presented at trial is ambiguous, even a relatively 
minor error requires reversal." Id. at 1391-92; see also 
O'Neal, 513 U.S. at 437 ("[W]here the record is so evenly 
balanced that a conscientious judge is in grave doubt as to the 
harmlessness of an error," the judge cannot find the error to 
be harmless.).

 Thus, although "[o]f course, in deciding whether an error 
has had a substantial influence on the jury, a reviewing court 
cannot help but look at the totality of lawful evidence present-
ed at trial," Smart, 98 F.3d at 1391 (citing Kotteakos, 328 U.S. 
at 763-64), Smart makes it clear that the appropriate inquiry 
is an effect-on-the-verdict test and not a guilt-based test: 
"[I]n a case where the evidence at trial is conflicting or 
ambiguous, the danger that an error will affect the jury's 
verdict is almost always substantial." Id. at 1392 (emphasis 
added). See also id. ("[I]f the other evidence presented in 
this case had been even slightly ambiguous, we would be 
required to reverse Smart's conviction.") (emphasis added). 
Indeed, even where erroneously admitted evidence is appar-
ently cumulative of lawful evidence, if it is "at least debata-
ble" that the erroneously admitted evidence "tipped the 
scales" towards a guilty verdict, a reviewing court should not 
deem the error harmless. Pryce, 938 F.2d at 1349-50. This 
is consistent with the rule that a constitutional error will not 
be deemed harmless unless the Government shows "beyond a 
reasonable doubt that the error complained of did not contrib-
ute to the verdict obtained." Chapman, 386 U.S. at 24. 
Where the evidence is even slightly ambiguous or conflicting, 
or where the error at issue may otherwise have tipped the 
scales towards a guilty verdict, the Government is unable to 
make such a showing, and the verdict must be reversed.

 We find that the evidence against Barron for the Sun Ray 
shootings, absent Williams' testimony as bolstered by the 911 
tapes, is not free from ambiguity. As Barron argues, Romeo 


Williams' eyewitness testimony was central to the Govern-
ment's case against Barron for the Sun Ray charges. Al-
though the jury arguably could have found Barron guilty even 
absent the error, the remaining evidence implicating Barron 
for the Sun Ray shootings is not so overwhelming as to 
compel us to conclude that the error did not affect the jury's 
verdict. Therefore, we reverse the jury's verdicts finding 
Barron guilty for the following charges arising from the Sun 
Ray incident: assaulting Bernice Douglas (count 56), assault-
ing Nefertari McCree (count 57), and possessing a firearm 
during a crime of violence (count 60). Count 61, charging 
Barron with possession of a firearm with an obliterated serial 
number, also arose from the Sun Ray incident. However, 
this charge arose solely from Barron's arrest following the 
incident; Williams' testimony and other information on the 
911 tapes had no bearing on this charge. Accordingly, we do 
not reverse this conviction.

 4. Barron's Remaining Convictions 

 Barron argues further that the erroneously admitted 911 
tapes render all of his convictions invalid, not just those 
arising from the Sun Ray incident. We disagree.

 The Government bears the burden of showing beyond a 
reasonable doubt that the error at issue did not contribute to 
the non-Sun Ray convictions. See Chapman, 386 U.S. at 24. 
In an effort to make this showing, the Government empha-
sizes that the 911 tapes came in accidentally in relation to the 
Sun Ray incident and did not pertain to any of the non-Sun 
Ray charges. In addition, the Government highlights eyewit-
ness identifications and other evidence implicating Barron for 
the other charges on which he was convicted.

 Barron fails to argue that the untainted evidence implicat-
ing him in the non-Sun Ray charges was ambiguous, nor does 
he highlight any specific exculpatory evidence exonerating 
him on the other charges. Rather, Barron offers two theories 
linking the taint of the error at issue to all of the charges 
against him. First, he argues that ballistics evidence links all 
of the charges together, and, thus, if the jury were to find 
Barron guilty for the Sun Ray shootings, the weapons used at 


Sun Ray link him to the other incidents as well. Second, he 
argues that the prosecution's trial theory emphasized that 
Cunningham and Barron were together engaged in a series of 
armed robberies, assaults, and murders throughout the sum-
mer in question, and that a finding that Barron joined Cun-
ningham in the Sun Ray shootings supports this modus 
operandi theory. In essence, Barron argues that the jury's 
finding against Barron for the Sun Ray charges, in the 
context of the prosecution's overall theory of the case, served 
as additional evidence against Barron for the remaining 
charges. Thus, Barron argues, if we assume that, absent the 
inadvertent admission of the unredacted tapes, the jury would 
have acquitted Barron of the Sun Ray shootings, the error 
must be deemed to taint all of the convictions against Barron.

 We are unable to find that the error affected the non-Sun 
Ray verdicts, in light of the Government's showings and 
Barron's failure to highlight any specific evidence conflicting 
with the evidence against him or to otherwise argue that the 
Government's case against Barron for the non-Sun Ray 
charges was somehow ambiguous. Cf. Smart, 98 F.3d at 
1390-92 (finding error harmless where evidence against de-
fendant was unambiguous, there was a virtual absence of 
exculpatory evidence, and it was "excruciatingly clear" that 
the jury did not believe the defense story; but stating that if 
the evidence had been ambiguous or conflicting, the harmless 
error standard would require reversal of even a relatively 
minor error).

 Barron's claim that the information contained in the 911 
tapes indirectly tainted the jury's non-Sun Ray verdicts is 
best construed as an argument that the error tipped the 
balance towards guilty verdicts on the non-Sun Ray charges. 
However, whether the Sun Ray verdicts might be construed 
as cumulative evidence against Barron with regard to the 
remaining charges in light of the on-going enterprise theories 
argued at trial is not dispositive under the applicable effect-
on-the-verdict test. Rather, we must examine the trial record 
as a whole in order to determine whether the error at issue 
influenced this jury to find Barron guilty of the non-Sun Ray 
charges.


 Although the prosecution apparently tried to use ballistics 
evidence and modus operandi arguments to tie the Appel-
lants together and to each of the incidents alleged, the jury 
did not appear to be swayed by these on-going enterprise 
theories. Significantly, although the jury convicted both Ap-
pellants for the vast majority of the charges arising from the 
fifteen alleged racketeering incidents, it did not convict on the 
RICO charges. In addition, the jury acquitted Cunningham 
but convicted Barron of charges relating to the armed rob-
bery of Officer Barnes and the Horace and Dickie's armed 
robbery, and acquitted Barron but convicted Cunningham of 
the charges relating to the Sibley Plaza armed robbery, even 
though Appellants were charged as having committed these 
crimes jointly. It appears plain that, contrary to Barron's 
arguments regarding the influence of the prosecution's on-
going enterprise theories, the jury was able to sift and sort 
through the evidence pertaining to each incident in order to 
determine Appellants' respective guilt for each charge al-
leged. Thus, we find Barron's argument that the inadvertent 
submission to the jury of the unredacted 911 tapes tipped the 
balance towards guilty verdicts on the non-Sun Ray charges 
unpersuasive. Accordingly, we decline to reverse Barron's 
non-Sun Ray convictions.

 C.Merger of Various Convictions for Sentencing Purposes

 1. Merger of Various D.C. Offenses 

 As the Government concedes, each Appellant's two convic-
tions for armed robbery arising out of the Sammy's Liquor 
incident (counts 31-32) should merge into one, since Appel-
lants robbed only the liquor store and not its employees. See 
United States v. Canty, 469 F.2d 114, 126-27 (D.C. Cir. 1972) 
(four tellers, but only one bank, robbed; only one conviction).

 In addition, as the Government concedes, each Appellant's 
armed robbery convictions arising from the Fair Liquor 
incident (counts 47-49) should merge with their felony mur-
der convictions (counts 50-51), because the indictment speci-
fied the armed robberies as the predicate for the felony 
murder counts. See Catlett v. United States, 545 A.2d 1202, 
1219 (D.C. 1988).


 2. Merger of Section 922(g) Charges

 All eight of Cunningham's convictions under 18 U.S.C. 
s 922(g) (counts 7, 17, 22, 26, 38, 54, 59, 67) should be merged 
into one. Contrary to the Government's suggestion, this is 
not merely a sentencing issue. Rather, the issue turns on 
whether the jury found all of the elements necessary to 
convict Cunningham for eight separate 922(g) charges. 

 When a felon possesses multiple weapons, only one offense 
is committed, unless the weapons are stored or acquired at 
different times or places. In other words, where there is 
more than one charge under section 922(g), separate acquisi-
tion and storage of the weapons is an element of the crimes 
charged. Although the language of section 922(g) does not 
expressly require a finding of separate acquisition and stor-
age in order to convict a defendant for multiple 922(g) 
charges where the possession of multiple weapons is alleged, 
courts have read this element into section 922(g). See United 
States v. Szalkiewicz, 944 F.2d 653, 654 (9th Cir. 1991) (citing 
United States v. Valentine, 706 F.2d 282, 294 (10th Cir. 1983) 
and United States v. Frankenberry, 696 F.2d 239, 245 (3d Cir. 
1982)).

 Uncertainty as to the unit of prosecution intended by 
Congress in section 922(g) exists because of the use of the 
ambiguous word "any" in defining the crime. 18 U.S.C. 
s 922(g) ("It shall be unlawful for [a convicted felon] . . . to 
receive any firearm or ammunition which has been shipped or 
transported in interstate or foreign commerce.") (emphasis 
added). As the Tenth Circuit explained in Valentine, judicial 
construction of such statutes is guided by the Supreme 
Court's decision in Bell v. United States, 349 U.S. 81 (1955). 
See 706 F.2d at 292-94. In Bell, the Court held that only one 
offense under the Mann Act, 18 U.S.C. s 2421, occurred 
where the defendant transported two women across state 
lines on the same trip and in the same vehicle. See 349 U.S. 
at 82-83; see also 18 U.S.C. s 2421 (making it a felony to 
transport in interstate commerce "any woman or girl for the 
purpose of protitution . . . .") (emphasis added). The Court 
explained that Congress "has no difficulty in expressing" its 
will "when it has the will . . . of defining what it desires to 
make the unit of prosecution and, more particularly, to make 


each stick in a faggot a single criminal unit. When Congress 
leaves to the Judiciary the task of imputing to Congress an 
undeclared will, the ambiguity should be decided in favor of 
lenity." Bell, 349 U.S. at 83; see also Valentine, 706 F.2d at 
293 & n.10 ("When a convicted felon simultaneously possesses 
two guns, . . . the definition of the offense . . . as possession of 
any firearm permits both the conclusion that only one offense 
has been committed and the conclusion that two seperate 
crimes have occurred.") (citing Bell and listing cases in which 
circuits have held section 922 to require a finding of seperate 
acquisition and storage in order to uphold multiple weapon 
possessions convictions).

 Whether the weapons were separately acquired or stored is 
a question of fact for the jury, not a question of law for the 
court. See United States v. Gaudin, 515 U.S. 506 (1995) 
(because materiality is an element of a violation of 18 U.S.C. 
s 1001, the Fifth and Sixth Amendments require that a 
conviction thereof rest on a jury finding of materiality); 
United States v. Dale, No. 97-3023, slip op. at 4 (D.C. Cir. 
Apr. 14, 1998). In this case, the jury was never instructed to 
find that the weapons were separately acquired or stored in 
order to convict on each section 922(g) charge, and thus these 
convictions must merge into one.

 III. Conclusion

 For the reasons explained above, we reverse Barron's 
convictions on counts 56, 57, and 60. Appellants raised 
several other challenges to their convictions, all of which have 
been considered by this court and found to lack merit. 
Therefore, the District Court judgment is affirmed with re-
gard to the remaining convictions.

 However, as explained above, various of Appellants' convic-
tions should have been merged for sentencing purposes. 
Accordingly, we remand to the sentencing court for resen-
tencing consistent with this opinion.

So ordered.